UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES W. PARKER, II,                )
                                    )
              Plaintiff,            )
                                    )
      v.                            )    CASE NO. 1:08-cv-0966-DFH-TAB
                                    )
MICHAEL J. ASTRUE, Commissioner of  )
the Social Security Administration, )
                                    )
              Defendant.            )


ENTRY ON JUDICIAL REVIEW


      Plaintiff James Parker seeks judicial review of a decision by the
Commissioner of Social Security denying his claim for disability insurance benefits
under the Social Security Act.  Acting for the Commissioner, an Administrative
Law Judge (ALJ) determined that Mr. Parker could perform some types of work in
the national economy.  This decision came after the third separate hearing on Mr.
Parker's current claim for disability.  The ALJ at the first hearing passed away
before making a decision.  A second ALJ took up the case and wrote an opinion,
but on motion from the plaintiff, he vacated the opinion and recused himself.  The
second hearing was before the current ALJ.  After his decision following that
hearing, the Appeals Council remanded the case for additional medical evidence.
The same ALJ held the third hearing and issued the decision now at issue.  This
lengthy history shows the complexity and difficulty of Mr. Parker's case, but since

the ALJ's decision was supported by substantial evidence, this court must affirm
the denial of benefits.

*Factual Summary*

Mr. Parker applied for benefits on January 9, 2002.  At that time, he was
39 years old.  Mr. Parker left school in the ninth grade and attended special
education classes.  R. 599.  He complained of intense headaches, short memory,
blackouts, back pain, and irritability.  He hypothesized that he might have organic
brain damage, back pain, and depression.  R. 214.  He was denied benefits in a
previous application on January 6, 2000.

As stated above, Mr. Parker's claim has a somewhat tortured administrative
history.  It was denied initially on May 16, 2002 and on reconsideration on
October 28, 2002.  R. 98-106.  The first of three hearings was held on August 21,
2003, after which the ALJ passed away.  R. 725-42.  On June 18, 2004, a second
ALJ issued an opinion denying the claim, but he later reopened the case and
recused himself.  R. 52-63, 70.  A third ALJ first heard the case on January 14,
2005.  R. 743-838.  He issued an opinion denying the claim on September 8,
2005.  R. 67-83.  The Appeals Council vacated the opinion and remanded it to the
same ALJ.  That ALJ held another hearing on October 31, 2007.  R. 839-937.  On
December 10, 2007, the ALJ denied the claim.  R. 15-30.  The Appeals Council

declined review of the opinion on June 14, 2008, six and a half years after Mr. Parker originally filed his claim.

Mr. Parker's severe problems date to injuries he suffered when he was attacked by someone wielding brass knuckles. This attack took place in 1986 or 1988. R. 863. As a result of the attack, Mr. Parker is now blind in his right eye and has a metal plate in his head. He blames the doctors at Wishard Hospital in Indianapolis for his blindness, asserting that he could still see before his post-attack surgery. R. 872. As a result of his treatment following the brass knuckles attack, Mr. Parker is extremely wary of medical professionals. This uneasiness, combined with his financial situation, means most of his treatment has been in the emergency room at Wishard Hospital in Indianapolis. He does not have a fully-developed medical record with consistent treatment of his maladies by the same physician or physicians.

Mr. Parker traces multiple medical problems to the brass knuckles attack. The primary problem is repeated blackouts and occasional seizures. The blackouts and seizures have no objective medical support, but Mr. Parker's mother testified that he would occasionally just appear to go to sleep. On multiple occasions she had to go and identify him when he blacked out in public places. R. 779. The spells lasted half an hour, and it was difficult to get him out of the spell. As a result, his mother did not allow him to do housekeeping and tried to

have someone home with him 24 hours a day.  R. 781.  She also asserted that he had more blackouts when he was more active.  R. 782.

Linked to these problems, Mr. Parker testified that he had little blackout spells about twice a week and big blackouts about every two months.  R. 761.  As a result, doctors instructed him not to drive a car, making him reliant on the bus for transportation.  He also asserted that he sometimes heard voices and testified that it sounded like the voice of a woman who was not his mother.

Mr. Parker testified that the blackout problem led to repeated terminations from employment.  His work history is voluminous.  From the time of the brass knuckles attack through 1993, he held a steady job as a dishwasher for a restaurant until it closed down.  From that point, however, Mr. Parker has been unable to keep any job for any lengthy period of time.  All told, Social Security lists dozens of separate jobs for Mr. Parker between 1991 and 2007.  R. 511-17.  Mr. Parker testified that his reasons for being terminated ranged from his need to take extra rest breaks to his short temper, which he claims also is a result of the brass knuckles assault.  He also dates problems with his right arm to the attack.  The attack "affected everything."  R. 767.

Mr. Parker has suffered many other injuries throughout his life.  The most serious injury occurred when he fell off his bicycle in 2001, which he testified

occurred after he blacked out while on the bicycle.  R. 785.  He also was stabbed in the right arm in 2002.  R. 788

The bulk of Mr. Parker's medical evidence comes from notes made during his repeated trips to the hospital emergency room.  Those reports generally involved particular traumas suffered by Mr. Parker or his more long-standing problems such as headaches and back pain.  In connection with his application for Social Security benefits, Mr. Parker underwent multiple examinations.  During a previous application for disability, Dr. Mazen Alsatie examined Mr. Parker and noted that he had "vague complaints of headaches, dizziness, and questionable 'passing out' episodes related to a head trauma."  R. 353.  Dr. Alsatie also noted that low back pain had developed in recent years and that Mr. Parker had difficulty getting on and off the examination table.

In connection with this claim for disability, Mr. Parker was examined by Dr. Ray Henderson in March 2002.  Dr. Henderson noted Mr. Parker's metal plate and various leg pains but found that he "should be considered able to perform all the usual activities of daily living."  R. 306.

After the initial hearing on this claim for disability, Mr. Parker was given a neurological evaluation by Dr. Dawn Zapinski.  Dr. Zapinski noted Mr. Parker's long problems with headaches and found that the blackout spells were probably not seizures.  Dr. Zapinski described what she considered to be appropriate work

limitations for Mr. Parker including:  "He should not push with the right or pull with the right because of the decreased vision on that side."  R. 431.

In 2002, Mr. Parker also received a psychological evaluation by Dr. Steven Herman.  Dr. Herman gave a variety of tests, including the Wechsler Memory Scale – Third Edition, which found average memory except for working memory, which was in the borderline range.  Dr. Herman found that Mr. Parker was an "extremely poor self-historian."  R. 436.  His final conclusion was:  "Despite his many reported limitations and difficulties, [Mr. Parker] appears to have no difficulty performing all necessary household duties to maintain his life."  R. 439. In 2005, Dr. Suzanne Leiphart tested Mr. Parker's intelligence.  Mr. Parker had a Verbal IQ of 67, a Performance IQ of 76, and a full scale IQ of 69.  The two scores below 70 are in the mild mental retardation range.  R. 600.

At Mr. Parker's second hearing before an ALJ, a neurologist and a psychologist testified.  The neurologist, Dr. Bonsett, was confused as to why Mr. Parker had not been tested for seizures.   A 1999 CT scan showed encephalomalacia of the right frontal lobe of his brain, which Dr. Bonsett thought could be a factor in his behavior.  Encephalomalacia is abnormal softness of the cerebral neurons.  Stedman's Medical Dictionary 565 (26th ed. 1995).  Dr. Bonsett thought that additional neurological testing could be done. The psychologist, Dr. Brooks, testified that Mr. Parker had a need for limited interpersonal contact and

noted other problems that Mr. Parker would have in a work setting, including attention problems and short-term memory deficiencies.  R. 816.

After the ALJ's decision, the Appeals Council remanded for additional medical testing to learn more about Mr. Parker's encephalomalacia and possible seizure disorder, including "a consultative neurological examination and medical source statements about what the claimant can still do despite the impairments. The examination should include a seizure workup with appropriate EEGs, and an MRI to determine the current status of the claimant's encephalomalacia."  R. 89. An MRI  (magnetic resonance imaging) was never performed because the ALJ was informed by the Disability Determination Bureau that an MRI was contraindicated for someone with a metal plate in his head.  The ALJ scheduled multiple neurological evaluations, but Mr. Parker either failed to attend or left before the evaluation could be completed.  Mr. Parker did submit to an updated EEG, which was "felt to be normal.  There are no lateralizing, localizing, or epileptiform activities noted."  R. 617.  Finally, a psychiatric functional capacity assessment conducted by Dr. William Shipley concluded that Mr. Parker's self-reported daily living activities "were not credible given that he has a long work history."  R. 587. Dr. Shipley found that Mr. Parker "appears to have the cognitive abilities and concentration necessary to complete tasks.  They [sic] can make work related decisions, remember locations and remember work like procedures."  R. 587.

At the final hearing before the ALJ, no neurologist testified.  An internal medicine doctor, Dr. Stump, testified consistent with the aforementioned facts. A vocational expert opined that Mr. Parker could do light work with some restrictions.  In response to a question about whether Mr. Parker could work if he required additional rest breaks, the vocational expert said that he could not.  R. 928.

### The Statutory Framework for Determining Disability

To be eligible for the disability insurance benefits he seeks, Mr. Parker must establish that he suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Mr. Parker was disabled only if his impairments were of such severity that he was unable to perform work that he had previously done and if, based on his age, education, and work experience, he also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to him in his immediate area, or whether he would be hired if he applied for work. 42 U.S.C. § 423(d)(2)(A).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

To determine whether Mr. Parker was disabled under the Social Security Act, the ALJ followed the familiar five-step analysis set forth in 20 C.F.R. § 404.1520.  The steps are as follows:

(1)   Has the claimant engaged in substantial gainful activity?  If so, the claimant was not disabled.

(2)   If not, did the claimant have an impairment or combination of impairments that are severe?  If not, the claimant was not disabled.

(3)   If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)   If not, could the claimant do his past relevant work?  If so, the claimant was not disabled.

(5)   If not, could the claimant perform other work given his residual functional capacity, age, education, and experience?  If so, then the claimant was not disabled.  If not, the claimant was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

*Standard of Review*

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.   42 U.S.C. § 405(g).   Because the Appeals Council denied further review of the ALJ's most recent findings, the ALJ's findings are treated as the final decision of the Commissioner.  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).  If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.   42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by weighing the evidence, resolving material conflicts, or reconsidering the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

The Commissioner must consider all relevant evidence and "may not select only that evidence that favors the ultimate conclusion." *Nelson v. Apfel,* 131 F.3d 1228, 1237 (7th Cir. 1997).  In reaching a decision, the ALJ "must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004), citing *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson*, 131 F.3d at 1234, or based the decision on serious factual mistakes or omissions.  *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

*Discussion*

Mr. Parker sets forth four reasons that the denial of benefits was inappropriate.  First, he argues that the ALJ erred in deciding that he did not satisfy Listing 12.05 for mental retardation.  Second, he argues that the ALJ's failure to have Social Security provide an MRI requires remand.  Third, he argues that the ALJ's credibility determinations were erroneous.  Finally, he makes a general substantial evidence challenge based on the ALJ's alleged failure to consider all relevant injuries.

I.      *Listing 12.05*

Listing 12.05 lays out the standard for demonstrating a disability based on

mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A.    Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded; or
> B.    A valid verbal, performance, or full scale IQ of 59 or less; or
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or
> D.    A valid verbal, performance, or full scale IQ score of 60 through 70, resulting in at least two of the following:
>        1.    Marked restrictions of activities of daily living; or
>        2.    Marked difficulties in maintaining social functioning; or
>        3.    Marked difficulties in maintaining concentration, persistence, or pace; or
>        4.    Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1., § 12.05.

The ALJ rejected Mr. Parker's claim under Listing 12.05 because "State

Agency medical consultants opined that the claimant's long work history

demonstrates a level of adaptive functioning inconsistent with mild mental

retardation." R. 22. Since the finding of no deficits in adaptive functioning is

based on substantial evidence, the ALJ's findings on Listing 12.05 must be upheld.

Mr. Parker satisfied the requirement for a low IQ score under paragraphs C or D with a verbal IQ score of 67 and a full scale IQ score of 69.  He also had multiple serious additional work-related limitations.  While this satisfies one of the Listing's subsections, Mr. Parker's claim fails based on the introductory paragraph.  The problem for Mr. Parker's claim is that he has not sufficiently shown that he had "deficits in adaptive functioning initially manifested during the developmental period."

Mr. Parker was in special education classes and left school in the ninth grade.  Absent contrary evidence, the low IQ score and special education classes might be sufficient to qualify under Listing 12.05.  This court agrees with the Eleventh Circuit's understanding of the early manifestation prong in *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir. 2001).  That court found that a claimant "need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two when she had offered evidence of low IQ test results after the age of twenty-two."  *Id.* at 1266.  The Eleventh Circuit relied in part on a statement by the Commissioner in the Federal Register about the word "manifested."  "We have always interpreted this word to include the common clinical practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence of current functioning demonstrate that the

impairment existed before the end of the development period." *Id.* at 1269, citing 65 Fed. Reg. 50746, 50772 (Aug. 21, 2000).

The Seventh Circuit reached a similar result in *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986).  In determining a claimant's mental impairment at a previous date, the court reasoned, "in the absence of evidence leading to a contrary result 'we must and do assume' that an IQ test taken after the insured period correctly reflects the person's IQ during the insured period." *Id.*, quoting *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985); accord, *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) ("a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning"), quoting *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001); *King v. Barnhart*, 2007 WL 968746, at *3 (S.D. Ind. Feb. 26, 2007).

In this case, however, the information available to the ALJ in his Listing 12.05 inquiry was not limited to Mr. Parker's IQ tests.  Dr. William Shipley interviewed Mr. Parker to determine his mental abilities.  He did not specifically address Listing 12.05, but his findings support the ALJ's ultimate determination. Dr. Shipley found that there was no evidence of mental retardation before age 22. He also found that Mr. Parker's long work history argued against intelligence limiting his ability to perform simple tasks.[1]  Dr. Shipley found that Mr. Parker

---

[1]This court remains unconvinced that the mere fact that a claimant has worked after the age of twenty-two means that he does not meet Listing 12.05. (continued...)

"appears to have the cognitive abilities and concentration necessary to complete tasks" and that he "can make work related decisions, remember locations and remember work like procedures." R. 587. Those findings indicate that Mr. Parker did not have deficits in adaptive functioning, which "denotes inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007). In relying on Dr. Shipley's report, the ALJ was not inappropriately requiring a diagnosis of mental retardation in order to find the Listing satisfied. Instead, he was simply relying on a psychiatric evaluation that found no deficits in adaptive functioning.

This court has remanded two separate ALJ's decisions in the past several years based on what it considered to be incorrect analysis under Listing 12.05. *King v. Barnhart*, 2007 WL 968746 (S.D. Ind. Feb. 26, 2007); *Hendricks v. Astrue*, 2009 WL 648610 (S.D. Ind. March 11, 2009). In those cases, however, the ALJ did not have a medical record stating both that the claimant was not mentally

---

[1](…continued)

It is possible that Mr. Parker, like the plaintiff in *King*, held jobs because: "When he had been in better physical shape at a younger age, he had managed to hold a number of different jobs, almost always for brief periods, despite his intellectual limitations. But the combination of physical impairments with his intellectual limitations is sufficient to satisfy the severity criteria of Listing 12.05C." *King v. Barnhart*, 2007 WL 968746, at *6 (S.D. Ind. Feb. 26, 2007); see also *Durden v. Astrue*, 586 F. Supp. 2d 828, 838 (S.D. Tex. 2008) ("an individual with Mild Mental Retardation may manage to hold an unskilled job despite her intellectual limitations, but when faced with an additional physical impairment, be unable to work, as recognized by Listing 12.05(c)"). Here, however, the determination of no deficits in adaptive functioning is not an ALJ's independent finding but instead the opinion of a medical professional.

retarded before he turned twenty-two and that he had no deficits in adaptive functioning.  The ALJ in this case had such evidence in Dr. Shipley's report.

Mr. Parker is also different from the claimants in *King* and *Hendricks* because, to the extent he currently manifested a low IQ and deficits in adaptive functioning, a possible explanation was the assault on Mr. Parker with the brass knuckles when he was in his mid-twenties.  Cf. *King,* 2007 WL 968746 at *3 (finding Listing 12.05(c) met where there was "no indication of any recent deterioration in his mental abilities or adult injuries that would cause these deficits").  The assault provided an obvious reason for Mr. Parker's current condition and took place after he was twenty-two years old.  The ALJ's findings relevant to Listing 12.05 are based on substantial evidence and not based on a misapprehension of the applicable law.

II.    *Failure to Provide MRI and Neurological Evaluation*

After the current ALJ issued his 2005 decision denying benefits, the Appeals Council remanded to the ALJ with instructions to perform three tasks.  The relevant instruction for this discussion was that the ALJ would:

> Obtain additional evidence concerning the claimant's encephalomalacia and possible seizure disorder in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.912-913).  The additional evidence will include a consultative neurological examination and medical source statements about what the claimant can still do despite the impairments.  The examination should

include a seizure workup with appropriate EEGs, and an MRI to determine the current status of the claimant's encephalomalacia.

R. 89.  By Mr. Parker's final hearing, neither an MRI nor a neurologic evaluation had been performed.  A neurologist was not present to testify at the hearing.  Mr. Parker argues that these failures violated his due process rights.

The ALJ defended his decision not to provide an MRI based on Social Security's own determination that an MRI was inappropriate for a person with a metal plate in his head.  The ALJ wrote:  "The Disability Determination Bureau confirmed that MRIs are contraindicated on persons who have metal devices in the body."  R. 18.  Mr. Parker responds with multiple websites from medical centers around the country showing that metal in the body will not always impede an MRI.

If feasible, the ALJ did have an obligation to provide an MRI to determine if Mr. Parker has brain damage.  The initial remand from the Appeals Council is consistent with Seventh Circuit precedent requiring the ALJ to develop a full and fair record.  "Failure to fulfill this obligation is 'good cause' to remand for gathering of additional evidence."  *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  In *Smith*, the ALJ relied on a ten-year-old X-ray in considering the claimant's arthritis.  The Seventh Circuit did not "see how the ALJ could have properly assessed the extent of Mr. Smith's arthritis without more updated X-rays."  *Id.*  Those older X-rays showed the early stages of degenerative disease.  It was

"incumbent upon the ALJ to order additional X-rays to ascertain the extent of the degradation of Mr. Smith's knees." *Id.* at 438.

In the initial hearing in this case, the ALJ did not fully appreciate this responsibility to develop a full record.  The record at that point included a 1999 CT scan that reported encephalomalacia of the right frontal lobe.  The neurologist, Dr. Bonsett, felt that he did not have sufficient information to see if this brain injury was causing Mr. Parker's reported seizures.  R. 799.  Dr. Bonsett attempted to testify about the additional information he would need to make a definitive determination, but the ALJ prevented him from finishing his thought.  Dr. Bonsett also testified that the evidence was indicative of brain damage, likely stemming from the attack on Mr. Parker with the brass knuckles.  R. 803.  Dr. Bonsett thought that Mr. Parker by this date "should have had an MRI to see what changes had taken place."  R. 805.

Given the statements by Dr. Bonsett about the need for an additional MRI, this court agrees with the Appeals Council's initial decision to remand the case in part for an MRI.  The ALJ's final decision simply states that an MRI was not possible according to Social Security's own medical personnel.  It is unclear what evidence is in the record that an MRI is not appropriate for a claimant with a metal plate in his head.  At the second hearing, the ALJ and Mr. Parker's attorney had the following testy exchange:

ALJ:  I don't know how it is I want to get through your head, because I wrote to you about three times and I talked to you here that DDS will not perform an MRI on somebody who has a metal plate in his head.  I have told you that 10 times and –

ATTY:  Why don't you tell it to the  –

ALJ:  – I wrote to you –

ATTY:  Why don't you tell it to the Appeals Council?

ALJ:  And I will – I told the Appeals Council, too.  So don't tell me what to do.

ATTY:  I'm not telling –

ALJ:  I know what to do.

ATTY:  – you what to do.  I'm not telling you what to do.

ALJ:  Well, you just told me why don't I tell the Appeals Council.  I did tell the Appeals Council.  The Appeals Council doesn't know what they are saying.  They will not do – DDS will not.  I explained to Region.  Region said they will not do it.  I talked to the Appeals Council.  They said they still want to do it.  I asked DDS.  I asked DDS.  DDS will not do it.  I said that to the Appeals Council.  So I don't know what else you want me to do.  So it's – this is – the ball is in your court.  What is it that you would like to have with this case?  Because everything that I have, everything that I can do has been done.

R. 841-42.  The record is otherwise devoid of information on the appropriateness of giving an MRI to someone with a metal plate in his head.  As stated above, the ALJ's opinion just states as unsupported fact that MRIs are contraindicated for people with metal devices in the body by the Disability Determination Bureau. The record does not appear to include DDB's policy on metal devices and MRIs or any written communication between the ALJ and the DDB.   The problem, however, is that no contrary evidence is in the record indicating that an MRI *is*

appropriate for someone with a plate in his head.  Mr. Parker's attorney did not offer such evidence at the hearing, and his brief to the court is not the place for new medical or scientific evidence.  This court is not in the position to evaluate the relative merits of an MRI for a person with a metal plate in his head.  Since the ALJ had told Mr. Parker's attorney on multiple occasions that the Disability Determination Bureau did not recommend an MRI, he should have been prepared to place in the record any evidence to the contrary.

Admittedly this presents a difficult situation for Mr. Parker.  His own serious medical problem that led to a plate being placed in his head is preventing him from receiving the testing that might help show that he suffers from brain damage.  This contradiction is also problematic in considering his repeated refusal to attend a neurological appointment.  The ALJ scheduled multiple appointments with a neurologist.  Mr. Parker did not attend the first two.  When he finally attended one, he got frustrated with the tests he was requested to take and left in the middle of the examination.  Mr. Parker's counsel argues that relying on Mr. Parker's failure to attend the appointments "uses the claimant's irrational angry behavior caused by his brain damage as a means to deny his claim of disability due to his irrational angry behavior caused by his brain damage."  Pl. Reply Br. 12.

The court appreciates the issues raised by the possibility that Mr. Parker's own condition prevented him from getting the necessary medical evidence that

would prove his disability.  There are limits, however, as to how far the Social Security Administration must go to help a claimant prove his case.  In this case, Mr. Parker is arguing that his due process rights were violated when the ALJ did not provide a consultative exam.  Here, the ALJ scheduled three exams.  Mr. Parker missed two and left early from the third.  The relevant regulation states that where the record needs to be more throughly developed, "we will ask you to attend one or more consultative exams at our expense."  20 C.F.R. § 404.1512(f).  Social Security has placed a requirement on itself to provide an independent examination, and the ALJ attempted to satisfy that requirement.  At its core, the disability determination remains premised on the principle that:  "In general, you have to prove to us that you are . . . disabled.  This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)."  20 CFR 404.1512(a).  Here, Mr. Parker's repeated failures to participate in a neurological evaluation excused the ALJ from fully complying with his obligation to get that evaluation completed.  This is particularly true where the ALJ took reasonable steps to get Mr. Parker the necessary medical evaluations.

The failure to provide an MRI is a slightly different question because Social Security was not even able to schedule an MRI.  In this case, the ALJ appropriately relied on the medical evidence that was ascertainable.  Pursuant to the Appeals Council's remand, Mr. Parker received an EEG in 2006 that was "normal with no lateralizing, localizing, or epileptiform activities."  R. 617.  Since

this evidence is the most recent and most complete look at Mr. Parker's brain, substantial evidence supports the ALJ's determination.  Together, the ALJ's steps after remand from the Appeals Council did not violate Mr. Parker's due process rights.

III.    *ALJ's Credibility Determinations*

Mr. Parker argues that the ALJ's credibility determinations were incorrect because he rejected the claimant's allegations primarily because they were not supported by objective medical evidence.  This argument is not particularly well-developed.  Primarily, Mr. Parker relies on Social Security Ruling 96-7p, which states that "allegations concerning the intensity and persistence of pain or other symptoms may not be disregarded solely because they are not substantiated by objective medical evidence."  In this case, the ALJ repeatedly noted that some of Mr. Parker's claimed symptoms were not substantiated by objective medical evidence.  These factual statements are a necessary consideration under the ALJ's statutory responsibilities.  The ALJ also went through the factors delineated in 20 C.F.R. § 404.1529(c) for determining credibility.   The ALJ made specific findings on all seven of these factors.  He relied in part on the claimant's daily activities, his lack of medication, and the lack of evidence of other treatments besides medication.   The ALJ's consideration of these factors undercuts Mr. Parker's assertion that the ALJ's decision was contrary to SSR 96-7p.  The ALJ

considered the lack of objective medical evidence, but he properly did not base his credibility determination solely on that criterion.[2]

IV.   *Lack of Substantial Evidence For Step 5 Determination*

Mr. Parker's final argument is a brief statement that substantial evidence does not support the ALJ's Step 5 determination that Mr. Parker could perform some light level jobs.  The argument was not fully developed, but Mr. Parker appears to argue that the ALJ did not fully consider all of his severe impairments in determining his residual functional capacity.  In his reply brief, Mr. Parker went into more detail but further confused the issue.  He complained not just that the severe impairments found at Step 2 were omitted in the final analysis but that some of Mr. Parker's impairments were not considered even at Step 2 itself.  Mr. Parker cannot change horses midstream.  A general assertion that the ALJ's decision is not supported by "substantial evidence" does not require the court to do a comprehensive review of a voluminous record searching for the claimant's best argument.  Mr. Parker's attorney has that job, and he decided that the Listing 12.05 argument and the denial of the MRI and neurological exam were the best arguments.  A general complaint about lack of "substantial evidence" is simply too

---

[2]Mr. Parker argues that the ALJ ignored or only selectively considered the evidence corroborating his allegations.  The only example he provides is the ALJ's notation of "no evidence of delusions or hallucinations."  R. 24.  The only medical record of hallucinations occurred in 1999, before Mr. Parker's previous unfavorable Social Security determination and before the time-period under consideration by this ALJ.

broad and does not shift to the court the obligation to develop and then evaluate an argument.

To the extent that Mr. Parker is arguing that the ALJ did not appropriately treat his headaches,  possible seizures, and blackouts properly at either Step 2 or Step 5, the argument must fail.  The ALJ noted that while the May 1999 EEG showed "right frontal craniotomy with adjacent encephalomalacia," the 2006 EEG was normal with no lateralizing.  R. 21.  Mr. Parker was not taking any pain medication for his headaches.  The ALJ relied on Dr. Zapinski's statement that Mr. Parker's symptoms did not sound like seizures.  R. 22.  Mr. Parker's response is that he has been to the hospital dozens of times, which combined with testimony by him and his mother, could allow an ALJ to find that his reported blackout problem is a serious medical need.  The ALJ's decision finding it is not a serious medical need, however, is supported by substantial evidence and must be upheld.

*Conclusion*

For the foregoing reasons, the court finds that the ALJ's decision denying benefits is supported by substantial evidence.   Accordingly, the decision is affirmed and final judgment will be entered.

Date: July 22, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Patrick Mulvany
mulvany@onet.net

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov